# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:13-cv-564-FDW

| | |
|---|---|
| KEITH L. CURETON, | )<br>) |
| Petitioner, | )<br>) |
| vs. | )     ORDER<br>) |
| STATE OF NORTH CAROLINA, | )<br>) |
| Respondent. | )<br>) |

**THIS MATTER** comes before the Court on Respondent's Motion for Summary Judgment, (Doc. No. 7), and on Petitioner's Motion for Extension of Time to File Response/Reply to Respondent's summary judgment motion, (Doc. No. 10).

## I. BACKGROUND

Petitioner is a prisoner of the State of North Carolina, who, on June 16, 2011, in Mecklenburg County Superior Court, was convicted after trial by jury of (1) resisting a public officer; (2) felonious breaking or entering; (3) larceny after breaking or entering; (4) felonious possession of a stolen firearm; (5) felonious possession of a firearm by a felon; and (6) achieving habitual felon status, and was sentenced to two consecutive terms of 100-129 months imprisonment, in cases 09 CRS 234842, 236447-48, 236801, and 73575. See (Doc. Nos. 8-3; 8-4; 8-5; 8-6; 8-7; 8-8; 8-9). On November 6, 2012, the North Carolina Court of Appeals filed a published opinion finding no prejudicial error. State v. Cureton, 734 S.E.2d 572 (N.C. Ct. App. 2012).

Petitioner represented himself at trial and he was represented by Mary March Exum on

1

appeal. Petitioner asserts in his pro se federal habeas application form that he has filed no other petitions, applications, or motions, with regard to this judgment of conviction, in any state court.

Petitioner's initial habeas petition was stamp-filed in this Court on October 7, 2013. (Doc. No. 1). On November 6, 2013, this Court ordered Petitioner to file an amended petition signed under penalty of perjury. (Doc. No. 3). Petitioner then filed an amended petition, signed under penalty of perjury and dated November 13, 2013, and it was stamp-filed in this Court on November 21, 2013. (Doc. No. 4). Petitioner contends in the habeas petition that: (1) the trial court violated his Sixth Amendment right to counsel by allowing Petitioner to represent himself at trial; and (2) the trial court violated his Fifth Amendment rights by admitting into evidence a statement Petitioner made to police made during a police interrogation.

On April 29, 2014, Respondent filed the pending motion for summary judgment. (Doc. No. 7). On April 30, 2014, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. (Doc. No. 9). On May 21, 2014, Petitioner filed a response to the summary judgment motion, as well as his pending motion for extension of time. (Doc. No. 11).

The North Carolina Court of Appeals summarized the facts from Petitioner's trial as follows:

> On 17 July 2009, at around 8:35 p.m., Mecklenburg County police officers Morton and Kodad stopped and questioned defendant after observing him standing in the middle of the street, failing to yield to traffic. Defendant appeared agitated and gave the officers a false name. Officer Kodad, suspecting defendant may be dangerous, approached defendant to place him in handcuffs. Before Officer Kodad could reach him, defendant fled on foot toward the breezeway at the Johnson and Wales college dorms. Both officers pursued defendant. At one point during the chase, Officer Kodad rounded a corner and saw defendant moving his hands toward the ground while hunched down at the bottom of a fence. Officer Kodad yelled at defendant to stop, but defendant turned and jumped

the fence. The officers continued their pursuit of defendant, and eventually captured him at the base of a brick fence.

After defendant was detained, Officer Morton retraced the path where defendant had fled on foot. At the exact location where Officer Kodad had observed defendant hunched down toward the ground moving his hands, Officer Morton discovered two loaded, silver handguns. One of the handguns was a Highpoint .380 with altered serial numbers. The other handgun was a Lorcin .380 with a serial number identifying it as a handgun that had recently been reported stolen from a residence in Perth Court.

Defendant was subsequently arrested and transported to the Mecklenburg County Jail. On 20 July 2009, at 9:27 a.m., Detectives Grande and Simmons arrived at the Mecklenburg County Jail to question defendant about the handguns as well as defendant's suspected connection to a robbery in Perth Court. At the beginning of the interrogation, Detective Simmons read through the "Waiver of Rights" form, which defendant refused to sign. When asked whether he understood the rights that had been read to him, defendant indicated that he was somewhat confused. Defendant asked the detectives several questions about his rights, particularly about his right to counsel. The detectives explained to defendant that it was his decision whether he wanted to speak to an attorney before answering any questions. Defendant never expressly requested the presence of an attorney. The detectives began interrogating defendant after he repeatedly indicated that he understood his rights and that he wanted to talk. Defendant ultimately confessed to having possessed both of the guns as well as to having committed three breaking or entering violations at Perth Court.

After being formally charged, defendant was appointed counsel on three separate occasions. Defendant's first court-appointed attorney, Gregory Tosi, met with defendant in February 2010. At their first meeting Tosi noticed that defendant appeared groggy and confused. Defendant claimed that he did not remember speaking with the police, nor did he understand why he was in jail. Concerned with defendant's capacity to stand trial, Tosi arranged to have defendant undergo psychological evaluations.

On 22 March 2010, Jennifer Kuehn, a certified forensic examiner, conducted an evaluation to determine whether defendant was capable of proceeding to trial. As a result of her examination, Kuehn concluded:

> Mr. Cureton's inability to communicate, whether intentional or due to undetermined cognitive limitations rendered it impossible for this screening to establish his capacity to proceed. Based upon his presentation at the time of the interview, it is my opinion the defendant would not be able to assist his attorney and participate in

> a meaningful way in his defense at this time . . . ; his abnormally
> disengaged affect and communication demands deeper evaluation
> to discern if the cause is related to his medications, his mental
> health, or malingering.

Kuehn subsequently recommended that defendant undergo further evaluation at the Pre-trial Center at Central Regional Hospital in Raleigh to determine his capacity to proceed.

On 10 June 2010, defendant was admitted to the pretrial evaluation unit at Dorothea Dix Hospital, and remained there until 17 June 2010. While there, defendant was evaluated by forensic psychologist Charles Vance, M.D., Ph.D. Dr. Vance's evaluation consisted of a thorough review of defendant's past medical and mental health records, numerous interviews with defendant, and ongoing observations of defendant's behavior while at Dorothea Dix. Defendant was described as "behaviorally cooperative but electively mute," he "showed poor eye contact . . . mumbled . . . [and] at times made gestures . . . to communicate his meaning." While Dr. Vance found defendant's behavior "unusual," he noted that defendant's "presentation . . . does not readily conform to the clinical pictures typically encountered for any known mental illness." In order to further clarify defendant's condition, Dr. Vance administered a modified version of the Competency Assessment for Standing Trial for Defendants with Mental Retardation test. Defendant provided incorrect answers to all but three of the twenty-six questions that he answered. Dr. Vance noted:

> As each question on this test had only two possible choices, it
> could be said that a person would have a 50% chance of guessing
> any item correctly . . . . [A]n individual who is completely
> incompetent . . . would still be expected to get approximately half
> of the items correct purely by guessing.

Dr. Vance believed there was "an overwhelming likelihood that [defendant] was . . . intentionally performing badly on this test . . . to make himself appear more impaired than was actually the case." At the end of the week-long evaluation period, Dr. Vance's final conclusion was that defendant "voluntarily and willfully" "presents himself as being too impaired to proceed to trial" and diagnosed defendant as "malingering." Dr. Vance further concluded, "based on his prior experiences with the legal system, and based on the mental health conditions he does and does not have" defendant was fully competent to stand trial.

On 30 June 2010, the Honorable Forrest D. Bridges entered an order finding defendant capable of proceeding to trial. Judge Bridges' ruling was based on Dr. Vance's forensic report, as well as defendant's demeanor while in court.

Prior to the hearing on defendant's capacity to proceed, Defense Counsel Tosi met with defendant to report the results of Dr. Vance's evaluation. Once defendant was informed of Dr. Vance's diagnosis, his behavior towards Tosi was markedly different than it had been previously. Defendant became angry, aggressive, loud and threatening, and accused Tosi of not doing his job. Additionally, defendant refused to speak with Tosi about the evidence, charges, or possible defenses available. Tosi believed the relationship had deteriorated to the point where he could no longer effectively represent defendant, and he moved to withdraw as counsel. This motion was granted and defendant was appointed a second attorney, Christopher Sanders, on 7 July 2010.

Sanders met with defendant on three separate occasions. During the first two meetings, defendant was agitated and combative. Defendant refused to discuss the discovery with Sanders, and he spent the bulk of the second meeting complaining about the plea offer, which he believed was overly harsh. During the third meeting, defendant was extremely loud, combative and animated. Defendant was irrational, uncooperative and continuously shouted at Sanders. At one point, defendant threatened to kill Sanders and spat in his face. This incident caused Sanders to believe his life was in jeopardy, and he feared defendant would harm him if he had the opportunity. On 25 August 2010, Sanders told the Honorable Calvin E. Murphy, Superior Court Judge Presiding, that he wanted to withdraw as defendant's counsel on the grounds that he feared for his personal safety. Judge Murphy allowed Sanders to withdraw as counsel and subsequently advised defendant that he was willing to appoint new counsel to represent defendant, but if defendant's conduct induced this counsel to seek withdrawal, the court might not appoint another attorney to represent defendant.

On 30 August 2010, the court appointed Lawrence Hewitt as the third counsel to represent defendant. Initially, Hewitt and defendant had a cooperative and productive relationship. However, this relationship quickly deteriorated after defendant began mailing Hewitt angry, accusative letters. In one such letter, defendant accused Hewitt of lying to his aunt, and stated that he had turned Hewitt in to the North Carolina State Bar for lying. In another letter, defendant wrote, "Don't come with . . . I no longer need you. I will represent myself in court, you lying assed bastard." Despite these letters, Hewitt tried to meet with defendant on several occasions, but their relationship became increasingly strained. Defendant was frustrated with Hewitt's inability to negotiate a more lenient plea offer, and he accused Hewitt of conspiring with the District Attorney. Defendant became increasingly uncooperative and defendant would often hover above Hewitt and yell at him during their meetings. Hewitt eventually concluded he could no longer effectively represent defendant, and moved to withdraw as counsel.

On 13 December 2010, Judge Levinson held a hearing to determine

whether defendant had forfeited his right to court-appointed counsel. After hearing the testimony of Tosi, Sanders and Hewitt, Judge Levinson ruled on 17 December 2010, that defendant had forfeited his right to court-appointed counsel.

On 28 January 2010, Judge Levinson held a status conference with defendant, pro se, and the District Attorney. During the conference, Judge Levinson addressed defendant and informed him that he faced the real prospect of an extremely lengthy period of incarceration. After reminding defendant that he had forfeited his right to court-appointed counsel, Judge Levinson expressed that he would nonetheless prefer it if defendant were represented by counsel. Judge Levinson told defendant that he would be willing to appoint another attorney if defendant would provide some sort of assurance that it would be meaningful, and that he would not engage in any misconduct that would cause the attorney to move to withdraw. Judge Levinson repeatedly asked defendant whether he wanted a lawyer, and defendant did not respond, even after Judge Levinson informed him that a simple thumbs up or thumbs down would suffice.

On 3 February 2011, Judge Levinson held a second conference with defendant, pro se, the District Attorney, and an attorney, Rick Beam. Having read the opinion in State v. Wray, 206 N.C.App. 354, 698 S.E.2d 137 (2010), Judge Levinson indicated that he was fully confident defendant had engaged in serious misconduct to support his earlier ruling that defendant had forfeited his right to counsel. Nonetheless, Judge Levinson wanted to provide defendant with another opportunity to request court-appointed counsel. Judge Levinson informed defendant that he had asked Attorney Rick Beam to meet with defendant to determine whether it would be useful for him to represent defendant, and whether defendant wanted Mr. Beam to represent him. Mr. Beam left the room to meet with defendant privately, but defendant refused to speak with him. Mr. Beam reentered the court and informed Judge Levinson that defendant was not interested in his representation. Judge Levinson noted on the record that there was significant evidence defendant knew what was going on and that he had communicated with others, including the court deputies while outside of the courtroom. Judge Levinson decided not to appoint standby counsel for defendant and declared, "even if I put aside the fact that he has forfeited his rights to counsel, he has not asserted his rights to counsel. To the contrary, I begged him and told him that I would provide counsel."

The trial began on 21 March 2011 and defendant was not represented by counsel. At first, defendant sat silently and refused to participate. However, as the trial went on, defendant began to conduct his own defense. Using gestures, defendant participated in jury selection. Additionally, during the first day of trial, defendant cross-examined Officer Morton, and was able to establish that Morton found no guns on defendant when he patted him down.

On the second day of trial, just before the State called its second witness, defendant suddenly informed the court that he wanted an attorney, because he did not understand the legal terms that had been used throughout the course of the trial. The court declined defendant's request on the grounds that the court had ruled on 17 December 2010 that defendant had forfeited his right to court-appointed counsel, and defendant failed to avail himself of multiple opportunities to request counsel subsequent to that date. After denying defendant's sudden request for counsel, the trial continued and defendant once again participated in his own defense. Defendant questioned Marcella Hunter, the owner of the stolen handgun, as well as the State's DNA expert. Additionally, defendant presented evidence on his own behalf, and recalled Officers Morton and Kodad for direct examination. Finally, defendant delivered a closing argument to the jury in which he summarized the weaknesses in the State's evidence, and argued that these weaknesses gave rise to a reasonable doubt as to his guilt.

The jury found defendant guilty of all charges. Defendant was ultimately sentenced to two consecutive sentences of between 100 and 129 months' imprisonment.

State v. Cureton, 734 S.E.2d at 576-79.

## II. STANDARD OF REVIEW

A. Summary Judgment Standard

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Section 2254 Standard

In addition to the motion for summary judgment standard set forth above, this Court must also consider the Petition for Writ of Habeas Corpus under the requirements set forth in 28 U.S.C. § 2254. Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Tice v. Johnson, 647 F.3d 87, 103 (4th Cir. 2011).

A claim is considered "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Young v. Catoe, 205 F.3d 750, 755 (4th Cir. 2000) (quoting Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999)). A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord [the petitioner] a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable." See Tice, 647 F.3d at 103 (citing Williams v. Ozmint, 494 F.3d 478, 483-84 (4th Cir. 2007)). "[W]e will not discern an unreasonable application of federal law unless 'the state court's decision lies well outside the boundaries of permissible differences of opinion.'" Id. at 108

8

(quoting Goodman v. Bertrand, 467 F.3d 1022, 1028 (7th Cir. 2006)).

In addition, "[a] federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Walker v. Martin, 131 S.Ct. 1120, 1127 (2011) (internal quotations and citations omitted). "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits." Id. (citation omitted). A procedural default also occurs "when a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Hyman v. Keller, No. 10–6652, 2011 WL 3489092, at *9 (4th Cir. July 21, 2011) (quoting Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998)); see also 28 U.S.C. § 2254(b)(1)(A).

Section 2254's exhaustion requirement demands that a petitioner give "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." Larry v. Branker, 552 F.3d 356, 366 (4th Cir. 2009) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). However, a petitioner may overcome a finding of procedural default by showing cause and prejudice arising from the asserted constitutional error. McCarver v. Lee, 221 F.3d 583, 591–92 (4th Cir. 2000). To show "cause," a petitioner may make "a showing that the factual or legal basis for the claim was not reasonably available to counsel." Id. at 591 (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)). To establish "prejudice," a petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage,

9

infecting his entire trial with error of constitutional dimensions." Id. at 592 (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

A habeas petitioner may also overcome his procedural default by demonstrating that the court's failure to consider the claim will result in a fundamental miscarriage of justice. Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)). The "fundamental miscarriage of justice" exception applies only to a narrow class of cases involving extraordinary instances "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." Dretke v. Haley, 541 U.S. 386, 392-94 (2004) (citing Murray v. Carrier, 477 U.S. 478, 494–96 (1986)).

### III. DISCUSSION

#### A. Petitioner's Ground One

In his first ground for relief, Petitioner contends that his Sixth Amendment right to trial counsel was denied because the trial court found that Petitioner had effectively forfeited his right to trial counsel through his misconduct. For the following reasons, Petitioner is not entitled to relief on this claim.

First, this ground for relief is procedurally barred. Petitioner raised this claim on direct appeal, but he failed to then raise the claim in a timely filed petition for discretionary review ("PDR") to the North Carolina Supreme Court, pursuant to N.C. R. APP. P. 15. The claim, therefore, is non-exhausted. See O'Sullivan v. Boerckel, 526 U.S. 838, 839-40 (1999) (claims not raised in petition for discretionary review to state's highest court from intermediate state appellate court on direct review are non-exhausted). Moreover, if Petitioner were to return to state court and attempt to raise the claim to the state Supreme Court, a PDR would no longer be

10

available to him as the time for filing such a petition has long since expired. See N.C. R. APP. P. 15(b) ("A petition for review following determination by the Court of Appeals shall be similarly filed and served within fifteen days after the mandate of the Court of Appeals has been issued to the trial tribunal."); N.C. R. APP. P. 32(b) ("Unless a court orders otherwise, its clerk shall enter judgment and issue the mandate of the court twenty days after the written opinion of the court has been filed with the clerk."). Petitioner's failure to present his claim to the North Carolina Supreme Court in a timely PDR, thus, renders his claim procedurally defaulted for purposes of this habeas proceeding. See O'Sullivan, 526 U.S. at 848.

In any event, Petitioner's first ground for relief fails on the merits. Petitioner raised the substance of his first ground for relief on direct appeal, and the North Carolina Court of Appeals adjudicated and denied this claim on its merits. The Court of Appeals held that the state did not violate Petitioner's Sixth Amendment right to counsel by allowing him to proceed at trial without counsel. As discussed in the opinion on appeal, the North Carolina Court of Appeals held that, by threatening his court-appointed attorneys, writing insulting letters, and spitting in the face of an appointed attorney, Petitioner engaged in serious misconduct essentially forfeiting his right to appointed counsel. The state court's adjudication of Petitioner's claim is neither contrary to, nor an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. Nor is the state court decision based on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings. For the purposes of this Court's habeas review, the Court notes that there is no Supreme Court case clearly establishing that a defendant's right to counsel at trial cannot be forfeited by the

defendant's misconduct.[1] The Supreme Court has held that other constitutional rights may be forfeited through misconduct. See Taylor v. United States, 414 U.S. 17, 19-20 (1973) (a defendant can, by his own misconduct, forfeit the right to be present at his own trial). Thus, on habeas review under § 2254(d)(1), this Court finds that the state court's adjudication of Petitioner's Sixth Amendment claim was neither contrary to nor an unreasonable application of clearly established Supreme Court law. Accord Chandler v. Blackletter, 366 Fed. App'x 830, 831 (9th Cir. 2010) ("Although the Supreme Court has never directly held that the right to counsel can be forfeited, the Court has also never held to the contrary, and has held that another fundamental Sixth Amendment right—the right to be present at one's own trial—can be forfeited through misconduct."); Gilchrist v. O'Keefe, 260 F.3d 87, 97 (2d Cir. 2011) ("At a minimum, these cases—in particular, Taylor—stand for the proposition that, even absent a warning, a defendant may be found to have forfeited certain trial-related constitutional rights based on certain types of misconduct."); Bultron v. Phelps, No. 06-708-GMS, 2010 WL 1336158, at *1-3 (D. Del. Mar. 31, 2010) (the state court's adjudication of petitioner's Sixth Amendment claim was neither contrary to nor an unreasonable application of federal law, where the trial court determined that the petitioner had forfeited his right to trial counsel by unreasonably refusing to cooperate with and being abusive and combative towards appointed counsel).

In sum, for the reasons stated herein, Petitioner's first ground for relief is procedurally

---

[1] Moreover, as Respondent notes, there is no U.S. Supreme Court precedent mandating that a criminal defendant with mental problems or low mental abilities must be represented by counsel and may not assert his right to self-representation, particularly where the defendant has engaged in misconduct that warrants the forfeiture of his right to counsel. The Supreme Court has also held that a court may allow a defendant to represent himself even where he has a mental disability. See Indiana v. Edwards, 554 U.S. 164, 178 (2008) (holding that a state may insist on counsel for some defendants who are competent enough to stand trial but may or may not be competent to represent themselves).

barred and is, alternatively, without merit.

B. Petitioner's Ground Two

In his second ground for relief, Petitioner contends that the trial court violated Petitioner's Fifth Amendment rights by admitting into evidence the statement he made to police during his interrogation. According to Petitioner, he never waived his Miranda rights, and his confession, therefore, should not have been admitted. First, as with Petitioner's first ground for relief, Petitioner's second ground for relief is also procedurally barred pursuant to O'Sullivan v. Boerckel, 526 U.S. 838. Next, Petitioner's second ground for relief is without merit. Petitioner raised the substance of his second ground for relief on direct appeal, and the North Carolina Court of Appeals denied the claim on its merits in a comprehensive opinion. State v. Cureton, 734 S.E.2d at 582. First, the state court found the following facts:

> On 20 July 2009, at 9:27 a.m., Detectives Grande and Simmons arrived at the Mecklenburg County Jail to question defendant about the handguns as well as defendant's suspected connection to a robbery in Perth Court. At the beginning of the interrogation, Detective Simmons read through the "Waiver of Rights" form, which defendant refused to sign. When asked whether he understood the rights that had been read to him, defendant indicated that he was somewhat confused. Defendant asked the detectives several questions about his rights, particularly about his right to counsel. The detectives explained to defendant that it was his decision whether he wanted to speak to an attorney before answering any questions. Defendant never expressly requested the presence of an attorney. The detectives began interrogating defendant after he repeatedly indicated that he understood his rights and that he wanted to talk. Defendant ultimately confessed to having possessed both of the guns as well as to having committed three breaking or entering violations at Perth Court.

Id. at 576. Based on the above facts, the North Carolina Court of Appeals examined Petitioner's claim as follows:

> Defendant first argues that the trial court erred in denying his motion to suppress the statements he made during the police interrogation on the grounds

that he never validly waived his Miranda rights, in particular, his right to counsel. Defendant argues that he never explicitly waived his Miranda rights, nor was he mentally competent to knowingly and intelligently do so. We disagree.

"The Fifth Amendment to the United States Constitution requires a criminal suspect to be informed of his rights prior to a custodial interrogation by law enforcement officers." State v. Harris, 111 N.C.App. 58, 65, 431 S.E.2d 792 (1993) (citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). These rights provide that he has the

> right to remain silent; that any statement may be introduced as evidence against him; that he has the right to have counsel present during questioning; and that, if he cannot afford an attorney, one will be appointed for him.

Simpson, 314 N.C. at 367, 334 S.E.2d at 58-59. "If the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him." Davis v. United States, 512 U.S. 452, 458, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362, 370 (1994).

Because the right to counsel is "sufficiently important to suspects in criminal investigations," the United States Supreme Court has afforded it "the special protection of the knowing and intelligent waiver standard." Id. (internal quotation marks and citation omitted). Under this standard, "[w]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege[.]" Edwards v. Arizona, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378, 385 (1981). "Whether a waiver is knowingly and intelligently made depends on the specific facts and circumstances of each case, including the background, experience, and conduct of the accused." Simpson, 314 N.C. at 367, 334 S.E.2d at 59. The prosecution bears the heavy burden of showing that the waiver was knowingly, intelligently, and voluntarily made. Id. at 367, 334 S.E.2d at 58-59.

As evidence that defendant did not knowingly and intelligently waive his right to counsel, defendant first points out that he never signed the "Waiver of Rights" form that was presented to him during the interrogation. This evidence does little, if anything to indicate that defendant did not validly waive his rights. As was explained by the United States Supreme Court in North Carolina v. Butler, although "[a]n express written or oral statement of waiver . . . of the right to counsel is usually strong proof of the validity of that waiver," it is neither sufficient, nor necessary for establishing waiver. 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979).

Defendant next argues that he was incapable of knowingly and

intelligently waiving his rights because his borderline mental capacity prevented him from fully understanding those rights. First, defendant emphasizes the fact that he has an IQ of 82 and a history of past mental illness. Although courts consider subnormal intelligence a relevant factor when determining the validity of a waiver, "[i]t is well established that ... this condition standing alone will not render a confession inadmissible if it is in all other respects voluntarily and understandingly made." Simpson, 314 N.C. at 368, 334 S.E.2d at 59. Furthermore, it is important to note that a later psychological evaluation diagnosed defendant as "malingering" and found him fully competent to stand trial. Although this evaluation occurred subsequent to defendant's arrest, the North Carolina Supreme Court has found such evidence persuasive in determining whether a defendant was competent to knowingly and voluntarily waive his rights at the time of the interrogation. See id. at 369, 334 S.E.2d at 60. Thus, beyond establishing that defendant had subnormal intelligence or a past history of mental illness, there must be compelling evidence that these limitations actually prevented defendant from fully comprehending his rights.

As further evidence of his inability to understand his rights, defendant highlights specific excerpts from the interrogation where defendant indicated that he was confused about his rights. For instance, when asked whether he understood his rights, defendant responded, "I understand them but I don't fully understand them all the way." Additionally, defendant requested to call his aunt so that she could help him understand the "Waiver of Rights" form. Despite this evidence of confusion, a full review of the interrogation transcript supports the trial court's finding that defendant understood his rights, and that he knowingly and intelligently waived those rights.

Defendant's initial confusion is fully remedied by the detectives' subsequent conversations with defendant. The detectives repeatedly asked defendant to specifically describe what he did not understand about his rights. In response to defendant's inquiries, the detectives explained that it was his choice whether he wanted to speak with an attorney, and they also clarified that he did not have to sign the waiver form as long as he stated that he understood the form's contents. After answering defendant's questions, the detectives subsequently asked defendant numerous times whether he fully understood his rights, and whether he wanted to speak with them. Each time defendant answered in the affirmative. Despite these repeated assurances, Detective Grande gave defendant one more chance to ask further questions, or to change his mind before he began the interrogation. The conversation was as follows:

> GRANDE: But, I want to make sure that we're really clear . . . in fairness to you, I just want to make sure if you have any questions about those protections. I want to answer those for you now.
> CURETON: What's the protection?

>       GRANDE: The rights that were explained. They just protect you ...
>       make sure you understand the rules of the game and how things
>       need to be done. You understand exactly what was read?
>       CURETON: Yeah.
>       GRANDE: Okay. And you want to speak to us about the break-in,
>       and we will talk about the warrants and anything else that we
>       might ask you about?
>       CURETON: Yeah[.]
>
>   In lieu of defendant's repeated assurances that he understood his rights and that he
>   wanted to continue talking to the detectives, we hold that the trial court did not err
>   in ruling that defendant knowingly and intelligently waived his Miranda rights.

Id. at 579-81. The state court concluded: "The State presented sufficient evidence to show that defendant knowingly, intelligently, and voluntarily waived his Miranda rights. Furthermore, the State presented sufficient evidence that a reasonably objective officer would not have believed defendant invoked his right to counsel. Finally, the State presented sufficient evidence to show that defendant's confession was voluntarily made." Id. at 577.

On habeas review under 28 U.S.C. § 2254(e)(1), this Court must presume the veracity of the facts as found by the North Carolina Court of Appeals unless Petitioner rebuts the presumption by clear and convincing evidence, which he has not done here. Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). Given the facts found by the state appellate court, that court's determination that Petitioner's Fifth Amendment rights were not violated was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court in Miranda and its progeny, nor was the state court's adjudication based on an unreasonable determination of facts, in light of the evidence presented in the state court proceedings.

In sum, for the reasons stated herein, Petitioner's second ground for relief is procedurally barred and is, alternatively, without merit.

## IV. CONCLUSION

For the reasons stated herein, Respondent is entitled to summary judgment as to all of Petitioner's claims, and the Court will dismiss the petition.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment, (Doc. No. 7), is **GRANTED**, and the petition is dismissed.

2. Petitioner's Motion for Extension of Time to File Response/Reply, (Doc. No. 10), is **GRANTED** nunc pro tunc.

2. It is further ordered that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

Signed: June 3, 2014

Frank D. Whitney
Chief United States District Judge